UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE GHOLSTON,

     Plaintiff,

v.                                            Case No. 12-11074

KEVIN BAUR, JEFFREY TYLUTKI,
BRADFORD VINCENT, FNU JOHNSON,           HON. AVERN COHN
and FNU JOHANSEN,

     Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT VINCENT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 25) AND
GRANTING IN PART AND DENYING IN PART DEFENDANT
BAUR'S MOTION FOR SUMMARY JUDGMENT (Doc. 27) AND
GRANTING IN PART AND DENYING IN PART DEFENDANT
TYLUTKI'S MOTION FOR SUMMARY JUDGMENT (Doc. 28) AND
GRANTING IN PART AND DENYING IN PART DEFENDANTS JOHNSON'S
AND JOHANSEN'S MOTION FOR SUMMARY JUDGMENT (Doc. 30)**

**I. INTRODUCTION**

     This police brutality 42 U.S.C. § 1983 case implicates a plaintiff who wanted to work until 11:00 PM in a McDonald's restaurant at the Detroit Metropolitan Wayne County Airport, while his supervisor told him to leave at 10:00 PM, and five Wayne County Airport Authority ("WCAA") police officers who forcibly removed him from the restaurant premises.

     Before the Court are four separate motions for summary judgment by the officers. Particularly the following papers have been filed:

     Doc. 25       Defendant Vincent's Motion For Summary Judgment (39 pages);

Doc. 26     Omnibus Statement Of Facts For The Individual Defendants' Motions For Summary Judgment (30 pages and 38 exhibits);

Doc. 27     Defendant Baur's Motion For Summary Judgment (22 pages);

Doc. 28     Defendant Tylutki's Motion For Summary Judgment (23 pages);

Doc. 30     Motion For Summary Judgment On Behalf Of Johnson And Johansen (15 pages);

Doc. 34     Response In Opposition To Defendants' Motions For Summary Judgment (35 pages and 12 exhibits);

Doc. 35     Plaintiff's Response To Defendants' Omnibus Statement Of Facts And Additional Facts That Require The Denial Of Summary Judgment (32 pages);

Doc. 43     Vincent's Reply To Plaintiff's Opposition To Motion For Summary Judgment (6 pages);

Doc. 44     Baur's Reply To Plaintiff's Opposition To Motion For Summary Disposition (5 pages);

Doc. 45     Tylutki's Reply To Plaintiff's Opposition To Motion For Summary Judgment (6 pages);

Doc. 46     Johnson And Johansen's Reply To Plaintiff's Opposition To Motion For Summary Judgment (5 pages); and

Doc. 47     Joint Statement of Material Facts (49 pages, 229 paragraphs).

Defendants' motions are GRANTED IN PART and DENIED IN PART. The reasons follow.

## II. BACKGROUND

### A. Gholston's Employment at McDonald's

Gholston was a maintenance employee at the McDonald's within the "sterile zone" of the McNamara Terminal of the airport. (Doc 34-2 at 10, Gholston Dep.). The sterile

2

zone is the area past security.  Only employees and ticketed passengers are allowed to be in the sterile zone.  (*Id.* at 12).

Gholston originally started as a full-time employee at the restaurant working more than forty hours a week.  (*Id.* at 15).  Gholston was eventually changed to a part-time employee.  (*Id.*).  As a part-time employee, Gholston says he worked from 6:00 PM until 11:00 PM on Mondays through Fridays, for a total of twenty-five hours per week.  (*Id.*).  However, Gholston maintains that on-site managers began asking him to leave early, and he sometimes worked less than twenty-five hours per week.  (*Id.* at 16).  Because Gholston was routinely being sent home early, he did not work enough hours to maintain his paid insurance benefits.  (*Id.*).  Thus, Gholston brought the insurance issue to the attention of his supervisor, Sharonda Dorsey.  (*Id.* at 17).  Dorsey, according to Gholston, assured him that he would not be sent home early so that he could maintain his insurance benefits.  (*Id.*).  Dorsey, however, denies that she ever told Gholston "that he could disregard the schedule posted . . . or that he could work" until 11:00 PM.  (Doc. 26-4 at 3, Dorsey Aff.).

## B. The Employment Dispute

On January 10, 2011, Gholston's shift started at 6:00 PM.  The on-site manager was Shantel Kennedy, an inferior to Dorsey.  The restaurant's posted schedule for January 10, 2011 indicates that Gholston's shift ended at 10:00 PM.  (Doc. 26-3 at 2, Shift Schedule).  Gholston, however, contends that based on his discussion with Dorsey, he was permitted to work until 11:00 PM notwithstanding the posted schedule.

Around 8:00 PM, Kennedy told Gholston that he was to leave at 10:00 PM.  (Doc. 26-2 at 10, Gholston Dep.).  Gholston told Kennedy that he would not leave at 10:00 PM because Dorsey told him he could stay until 11:00 PM.  (*Id.*).

3

At 10:00 PM, Kennedy instructed Gholston multiple times to "check out and conclude his shift." (Doc. 26-2 at 3, Kennedy Aff.). Gholston refused. Kennedy says that Gholston then threatened to punch her, and that she told security to call the airport police. (*Id.*). Gholston denies that he threatened Kennedy. He does admit that he refused to leave. After refusing to leave, Gholston says that Kennedy left and returned with a police officer. (Doc. 34-2 at 19, Ghoslton Dep.).

## C. Baur Arrives

Baur says he was dispatched to respond to an "unknown incident" at the restaurant and was the first police officer to arrive around 10:30 PM. (Doc. 26-8 at 3, Baur Aff.). On arrival, Baur spoke to Kennedy inside the restaurant. (*Id.*). Kennedy told Baur that she asked Gholston to leave a few times, but that Gholston refused to leave and was working "off the clock." (*Id.*).

Baur observed Gholston mopping the floor, approached him, and asked him to leave. (*Id.*). Baur says that, after asking Gholston to leave multiple times, Gholston stated that he was not going to leave until 11:00 PM. (*Id.*). Gholston says he asked Baur for his name and badge number multiple times, and that he would leave if Baur provided him with this information. (Doc. 34-2 at 20, Gholston Dep.).

The parties disagree about the events that happened next.

## D. Dispute in the Kitchen Area

### 1. Gholston's Version

Baur provided Gholston with his name. Gholston then asked Baur that he be allowed to go to the back room and retrieve a pen to allow him the opportunity to write down Baur's name and badge number. (*Id.* at 22). Baur did not allow him to go to the

4

back.  (*Id.* at 23).

After Baur refused to allow Gholston to retrieve a pen from the back room, Gholston, without telling Baur, turned and walked to the kitchen to get his coat.  (*Id.*).  Gholston was followed by Baur and Kennedy.  With his coat in hand, Gholston again asked Baur for his name and badge number.  (*Id.* at 24).  Baur told Gholston that he would be arrested if he asked for Baur's name and badge number one more time.  (*Id.*).

Gholston explained at his deposition what happened next that led to his arrest:

> Q:    And then what happened?
>
> A:    And I asked him – I asked him "what would I be arrested for?  What did I do?  I didn't think I could be arrested for asking you your name and your badge number."
>
> Q:    And then what happened?
>
> A:    He said if I said it again, he was going to arrest me.
>
> Q:    So he gave you another warning?
>
> A:    Yes.
>
> Q:    Stop talking or I – and let's go or I'm going to arrest you?
>
> A:    Yes.
>
> Q:    Then what happened?
>
> A:    Well, I didn't think you can – you could – I could be arrested for talking.  I'm a free citizen.
>
> Q:    So you asked him another question?
>
> A:    Yeah.  I asked him why – how could I be arrested for talking?  I'm just asking him for his name and his badge number.
>
> Q:    And then what happened?

5

> A:    He told me to turn around and put my hands behind my
>        back.  I was going to jail.

(*Id.* at 24).

At this point Baur radioed for backup.  (*Id.* at 24–25).

While waiting for backup, Gholston and Baur discussed why Gholston was being arrested.  (*Id.* at 25).  During this discussion, a second officer arrived at the McDonald's.  (*Id.*).  Gholston felt relieved when the second officer arrived.  He began to talk to the officer and told him what had happened up to this point.  The officer told Gholston that he was going to be arrested.  (*Id.*).  Gholston was told again to turn around and put his hands behind his back.  He did not comply.

A third officer arrived at the McDonald's.  Gholston again explained the situation to the third officer.  The third officer also told Gholston that he was under arrest.

After talking to the third officer, one of the officers pulled out his taser gun.  Gholston was eventually tased.  Gholston explained the events leading up to him being tased:

> Q:    And then what happened?
>
> A:    When he asked me to leave, after I explained to him
>        what was going on, I noticed one guy grabbing for – I
>        thought it was his gun – but it was a Taser.
>
> Q:    Okay.  And then what happened?
>
> A:    Well, I told him that "don't use that Taser on me."  I told
>        him I had asthma, and I didn't know what kind of effect
>        that would have on me.  I told him I had arthritis and
>        other medical problems.  "Don't shoot me with this
>        Taser."
>
>        He said, "Well, turn around and put your hands behind
>        your back."  And I was trying to explain to him, "For
>        what?"  I didn't think it was legal that you can be
>        arrested for asking an officer for his name and badge

6

> number.
>
> And while I was explaining that to him, he shot his Taser and stuck into my body.  He Tased me.

(*Id.* at 25).

After one of the officers tased Gholston, all three officers rushed to him, threw him to the ground, and put handcuffs on him behind his back.  Gholston explained at his deposition:

> The officers grabbed me.  They all rushed me at one time and threw me to the ground.  One officer smashed my head to the ground and cracked my tooth.

(*Id.* at 26).

While in handcuffs, Gholston continued to be tased from the back.  (Doc. 26-2 at 36–37, Gholston Dep.).

Gholston explained what occurred in the kitchen in a "Citizen Complaint" filed with the airport police.  (Doc. 26-12 at 4, Gholston Citizen Complaint).  In the complaint, Gholston explained that after being hit with the taser, he "felt as though [he] was going to die."  (*Id.*).

### 2. Defendants' Version

Baur told Gholston that he would give him his badge number after Gholston left the premises.  (Doc. 26-21 at 5, Wayne Metro Airport Police Case Report).  Gholston refused to leave.  He stated that he would not leave until 11:00 PM.

Baur followed Gholston to the back of the restaurant near the dining area when Gholston went to get his coat.  While they were near the back, Gholston started to argue with Baur.  (Doc. 20-8 at 4, Baur Dep.).  Baur placed Gholston under arrest for disorderly

conduct.  (*Id.* at 5).  When Baur told Gholston he was under arrest, Gholston pulled his hands up to his chest and clenched his fists.  (*Id.*).  Gholston told Baur that "he wasn't going."  (*Id.*).  Baur tried to handcuff Gholston; he "grabbed his right wrist," but Gholston pulled away from Baur.  (*Id.*).

After Gholston pulled away from Baur, Baur pulled out his taser gun and ordered Gholston to put his hands behind his back.  (*Id.*).  Rather than comply, Gholston ran to the kitchen, which is three to five feet away.  (*Id.*).  Baur called for backup and followed Gholston to the kitchen.  (*Id.*).

On the way to the kitchen, Baur dropped his taser gun on the floor attempting to holster it.  (*Id.* at 6).  When Baur reached Gholston, he tried again to arrest him by grabbing his right wrist.  (*Id.* at 5).  Gholston pulled away.  (*Id.*).  Baur grabbed Gholston's right arm but Gholston would not allow Baur to put the handcuffs on.  (*Id.*).  Baur struggled with Gholston for about five minutes.

### i. Tylutki Arrives

While Baur was trying to secure Gholston to arrest him, Tylutki arrived at the scene. (*Id.* at 6).  As Tylutki walked through the kitchen door, Baur told Tylutki to tase Gholston. (*Id.*).  Baur did not have time to tell Tylutki what was going on because Gholston was fighting with him.  (*Id.*).

After saying "taser" three times, Tylutki tased Gholston.  (*Id.* at 6–7).  The probes of the taser went into Gholston's chest.  (*Id.* at 7).  Gholston immediately pulled them out. (*Id.*).  Tylutki ran to Gholston to grab his left arm which was free.  (*Id.*).

Gholston continued to resist Baur and Tylutski.  Tylutski observed Gholston trying to strike Baur.  (Doc. 26-9 at 5, Tylutski Dep.).

8

### ii. Vincent Arrives

While Baur and Tylutski were struggling with Gholston, Vincent arrived at the scene. (Doc. 20-8 at 7, Baur Dep.). When Vincent walked inside the restaurant, Kennedy pointed him in the direction of the kitchen, and Vincent could hear "some wrestling noise." (Doc. 26-10 at 4, Vincent Dep.). Vincent approached the "little hallway that leads into the kitchen" and saw Baur and Tylutski in a confrontation with Gholston. (*Id.*). At his deposition, Vincent described the scene:

> A:   I observed that the two officers were giving him verbal commands, like you're under arrest, put your hands behind your back. I noticed that there was a taser out.
>
> Q:   Who had the taser out?
>
> A:   I don't recall at this time. I just know that there was a taser out.
>
> [I] [o]bserved Mr. Gholston facing the metal rack that was in the hallway. There was a large metal rack. He had his right hand on the metal rack.
>
> I approached and I can hear the officers again say that he was under arrest and he needed to – you're going to be going to the station or [we're] taking you in. I don't recall exactly.
>
> So at that time I stepped forward, grabbed Mr. Gholston's right arm in an attempt to assist the officers in taking him into custody. At that exact same time I'd stepped on one of the racks, the hamburger bun racks, and the floor was completely greasy, slimy. You couldn't hardly stand on it without sliding your feet, real slippery. I stepped on that rack and slid the same time I was holding his arms. So basically he was just holding me up while I was trying to get my balance.
>
> I believe at that time . . . Tylutki was going to taser him again because he still was resisting.

9

(*Id.* at 4–5).

During the struggle, Tylutski used his taser three to four more times.  (Doc. 20-8 at 7, Baur Dep.).  After Gholston was tased for a final time, the officers lowered him to the floor and turned him on his stomach.  (Doc. 26-10 at 5, Vincent Dep.).  Vincent and Baur grabbed Gholston's arms, placed them behind his back, and applied handcuffs on him. (*Id.*).

**E. Gholston Complains About Handcuffs**

After getting Gholston in handcuffs, the officers "stood him up on his feet." (Doc. 26-8 at 9, Baur Dep.).  The officers walked Gholston out to the front of the restaurant. Gholston began to complain that the handcuffs were on too tight.  According to Gholston, Baur looked at the cuffs but did not loosen them; "[h]e looked at them and said they were fine." (Doc. 26-2 at 28, Gholston Dep.).  Baur disagrees.  Baur admits that Gholston complained about the handcuffs being on too tight but says that when Gholston complained, he loosened them.  (Doc. 26-8 at 9, Baur Dep.).  According to Baur, after loosening the handcuffs, they were "double locked," meaning that they would not be able to dig into Gholston's wrists.  (*Id.*).  Vincent testified at his deposition that he heard Gholston complain about the handcuffs being on too tight and watched Baur loosen them within a minute of Gholston's complaint.  (Doc. 26-10 at 6, Vincent Dep.).

Around the time Gholston began complaining about the handcuffs being on too tight, Johnson and Johansen arrived at the scene.  Johnson says that he arrived at the scene and saw Gholston "on the floor in the hallway between the public area of the restaurant and the back room." (Doc. 26-15 at 3, Johnson Req. for Admission).  Johnson observed Baur "spend some time adjusting [Gholston]'s handcuffs."  (*Id.*).  According to Johnson, after

10

Gholston's handcuffs were readjusted, he never complained about his wrists hurting or the handcuffs being on too tight.  (*Id.*).

Johansen also says that when he arrived, Baur and Vincent were simultaneously readjusting the handcuffs.  (Doc. 26-16 at 3, Johansen Req. for Admission).  After the handcuffs were readjusted, according to Johansen, Gholston did not complain that the handcuffs were too tight.  (*Id.*).  Johansen stated that Gholston was "asking about his asthma medications and Airport badge" but "made no mention of his handcuffs after they were re-adjusted. . . ."  (*Id.*).

Gholston maintains that the handcuffs were not loosened because "they were still cutting into [his] wrist[s]."  (Doc. 26-2 at 35, Gholston Dep.).  At his deposition, Gholston explained that, "[y]ou could see blood on my – they were still cutting into both of my wrist[s]."  (*Id.*).

## F. Gholston Escorted to Patrol Vehicle

Johnson and Johansen escorted Gholston to a patrol vehicle with Vincent following.[1] While Vincent was standing outside of the patrol vehicle, he requested that the airport fire department respond to the scene to determine whether Gholston needed medical help. (Doc. 26-10 at 6, Vincent Dep.).  Vincent does not recall if Gholston complained about his handcuffs being too tight when he was in the patrol vehicle.  (*Id.*).

Gholston testified at his deposition that he was complaining about his breathing,

---

[1] Vincent testified at his deposition that he believed Baur and another officer escorted Gholston to the patrol vehicle.  (Doc. 26-10 at 6, Vincent Dep.).  The Joint Statement of Material Facts, however, says that Johnson and Johansen escorted Gholston to the patrol vehicle with Vincent following.  (Doc. 47 at 23–24 ¶ 108, Joint Statement of Material Facts).

11

injuries, pain in the wrist, and other issues.  (Doc. 26-2 at 18, Gholston Dep.).  Baur's use

of force report noted that Gholston's left wrist was injured and his front tooth was chipped,

and that he suffered from hyperventilation.  (Doc. 26-22 at 2, Baur Use of Force Report).

## G. Paramedic Arrives at the Scene

Shawn Thibeau, an emergency medical technician ("EMT") employed by the WCAA

fire department, was the first paramedic to arrive at the scene.  Thibeau compiled an "EMS

Run Form" while talking with Gholston.  (Doc. 26-18 at 2).  Thibeau's report states that

Gholston was tased and complained of left wrist pain.  (*Id.*).  Thibeau noticed

swelling/bruising in Gholston's left wrist.  (*Id.*).  The report also states that Gholston was

handcuffed and tased but that the handcuffs were loosened prior to Thibeau's arrival.  (*Id.*).

Thibeau noted that Gholston was hyperventilating but that his lung sounds were clear.

(*Id.*).

Thibeau's report states that he was not hindered by any police officers while

inspecting Gholston.  (*Id.*).  Gholston, however, testified at his deposition that the

paramedics "were asking the officers to loosen the handcuffs."  (Doc. 26-2 at 18, Gholston

Dep.).  One of the police officers, according to Gholston, said not to loosen the handcuffs.

(*Id.*).  Gholston testified:

> We sat in the police car, and the paramedics were checking my
> breathing and checking the handcuffs, and he asked the
> officer, again, about the handcuffs, and he wouldn't [loosen
> them].
>
> He said that they're not too tight, and you can, clearly, see how
> it was cutting through my hand.  It was bleeding on one wrist.

(*Id.*).

**H. Gholston Transported to Police Station**

Gholston was transported to the WCAA Police Station by Johnson and Johansen. Vincent followed.

On arrival at the police station, Johansen handcuffed Gholston to a bench. (Doc. 26-16 at 4, Johansen Req. for Admission). Gholston showed Vincent that his tooth was chipped and claimed that it happened during the McDonald's altercation. (Doc. 34-6 at 7, Vincent Dep.). Gholston was also complaining about injuries to his wrists. (*Id.*).

Vincent explained at his deposition what happened next:

> We tried to initiate the booking procedure, do a fingerprint and book him in, but he was very – he was still kind of breathing heavy and he was nonresponsive to our commands still. Instead of sitting on the bench, the lock-up bench he slid off and sat on the floor and refused to answer any of our questions and refused to get back up and sit on the bench.

(*Id.* at 8).[2]  Because Gholston "was still breathing kind of heavy and he had some other complaints he was complaining about," the officers called for paramedics for a second time. (*Id.*).

**I. Paramedic Arrives at Police Station**

Dillon Dominczyk, an EMT employed by the WCAA fire department, arrived at the police station. Dominczyk examined Gholston and filled an "EMS Run Form" report. (Doc. 26-20 at 2–3). In Dominczyk's report, he noted that Gholston was in police lockup and handcuffed to the seat. (*Id.*). He reported that Gholston appeared "anxious." (*Id.*).

---

[2] The events that occurred in the booking room were recorded on police video. (Pl's. Ex. F – Filed Under Seal). There is no audio in the video. In the video, Gholston can be seen slouched on the bench to which he is handcuffed. The video contains six gaps. Defendants say that the video recording software malfunctioned. The gaps are up to five minutes in length.

13

Gholston told Dominczyk that he was tased, forced to the ground, and handcuffed.  (*Id.*).
Gholston also told Dominczyk that his left wrist was injured and swollen, and his tooth was
chipped.  (*Id.*).  Dominczyk applied an ice pack to Gholston's left wrist for the swelling.
(*Id.*).   The officers informed Dominzyck that Gholston was uncooperative prior to
Dominzyck's arrival and that he had to be restrained.  (*Id.*).  Dominzyck also noted that
Gholston's breathing was normal.

**J. Gholston Transported to Hospital**

Gholston was eventually transported by ambulance to the Oakwood Annapolis
Hospital.[3]  Baur escorted Gholston to the hospital in the ambulance.  Gholston remained
under arrest and handcuffed in the ambulance.  (Doc. 34-5 at 8, Baur Dep.).  On arrival at
the hospital, Baur gave Gholston a citation for disorderly conduct and resisting/obstructing
arrest.  (*Id.*); *see also* (Doc. 26-23, Citation).  Baur then released Gholston from custody
and left the hospital within ten minutes.  (Doc. 34-5 at 8, Baur Dep.).

The hospital report notes that Gholston was brought to the hospital because he was
having breathing difficulty and pain in his wrists.  (Doc. 26-25 at 8, Hospital Report).
Gholston was diagnosed with acute asthma, acute anxiety, and wrist area pain.  (*Id.* at 5).
X-rays were taken; Gholston did not have a fracture but he did have soft tissue swelling in
the wrists.  (*Id.* at 38).  The nurse documented three abrasions on Gholston's body, one on

---

[3] Gholston says he was never asked if he wanted to go to the hospital.  Rather, he had
to repeatedly ask to be taken to the hospital.  He says that the police officers told him he
was free to go, but he told them that he could not breath and needed to go to the
hospital.  Gholston cites pages 121–23 of his deposition for this proposition but neither
party has supplied the Court with these pages of Gholston's deposition.
   Defendants say that Dominczyk asked Gholston if he wanted to go to the
hospital, per protocol.

his left wrist, the second on his upper right back, and the upper back of his right arm.  (*Id.*
at 33).  Gholston was discharged the following morning and prescribed medication for the
asthma and the pain.  (*Id.* at 5).  Gholston was also directed to follow up with his primary
care doctor.  (*Id.*).

### K. The Taser Report

Each time an officer uses a taser, certain data is recorded and maintained in a
database.  The taser report reflects that Tylutski used the taser nine times during the
incident.  The taser was activated once for six seconds, three times for five seconds, once
for four seconds, once for three seconds, twice for one second, and once for zero seconds.
(Docs. 26-26 and 26-27, Taser Report).

### L. Gholston Fired

On January 12, 2011, Gholston was fired by McDonald's for insubordination based
on his refusal to leave the restaurant when asked to do so by Kennedy.  (Doc. 26-24 at 2,
Separation Form).  Gholston did not return to work at McDonald's after the incident.

### M. Gholston Files Citizen Complaint

On January 18, 2011, Gholston filed a citizen complaint with the WCAA police.
(Doc. 26-12, Gholston Citizen Complaint).  In the complaint, Gholston described in detail
what occurred on the date of the incident.  Gholston and Baur were both interviewed by a
detective after Gholston filed the complaint; the detective generated a report summarizing
the interviews.  (Doc. 26-13, Detective Report).

### N. Gholston Pleads No Contest

Gholston pled no contest to disorderly conduct in December of 2012 in state court.
Gholston was required to perform 24 hours of community service.  (Doc. 26-2 at 4–5,

15

Gholston Dep.).

## III. STANDARD OF REVIEW

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;

16

> (3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

## B. Qualified Immunity

When government officials perform discretionary functions, they are immune from suit through qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Supreme Court applies a two-step inquiry when determining qualified immunity claims: "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right.  Second . . . , the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 815–16 (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Courts may exercise discretion in deciding which of the two prongs to address first.  *Id.* at 818.

As the Sixth Circuit has explained,

17

Because "[q]ualified immunity is an affirmative defense . . . [t]he defendant bears the burden of pleading" it in the first instance. The burden then shifts to the plaintiff, who must show that the official violated a right so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." The plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies and the state official is proof against the plaintiff's suit.

*Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012).

## IV. DISCUSSION

In a § 1983 case, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008)). Indeed, "[a]s a general rule, mere presence . . . , without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* (citation and quotation marks omitted).

Gholston says that:

(1)   Tylutki used excessive force by tasing him;

(2)   Baur, Tylutki, and Vincent used excessive force by slamming his head into the ground;

(3)   Baur, Johnson, Johansen, and Vincent used excessive force by failing to adjust his handcuffs; and

(4)   Baur, Johnson, Johansen, and Vincent were deliberately indifferent to his serious medical needs.

The Court discusses each claim in turn.

18

**A. Excessive Force (Count I)**

**1. Legal Principles**

**i. Excessive Force – Generally**

Under the Fourth Amendment, an officer may not use excessive force to effectuate an arrest.  *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)).  "Courts must determine whether a particular use of force is reasonable based on 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight'."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386 (1989)).  Police officers are given deference for "on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case."  *Id.* (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).

**ii. Excessive Force – Use of Taser**

There are two distinct classifications of "taser cases."  The first category of cases "involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers."  *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012).  In these cases, "courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident."  *Id.* (collecting cases).  The second group of cases involve plaintiffs who "ha[ve] done nothing to resist arrest or [are] already detained" but nonetheless tased.  *Id.* at 496 (collecting cases).  In these cases, courts hold that "a § 1983 excessive-force claim is available, since 'the right to be free from physical force when one

19

is not resisting the police is a clearly established right.'" *Id.* (citations omitted).[4]

### iii. Excessive Force – Handcuffing

As the Sixth Circuit has explained, "[t]he Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Board of Trustees of Green Tp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing.'" *Id.* (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)). To satisfy the third element, it is enough for a plaintiff to show he or she suffered from bruising, skin marks, or attendant pain. *Id.* at 402–03.

### 2. Analysis

#### i. Tylutki's Use of the Taser

Gholston has established a genuine issue of material fact whether Tylutki's use of the taser was excessive and in violation of the Fourth Amendment.

Gholston testified at his deposition that Tylutki tased him the first time while Gholston was talking to Baur, Vincent, and Tylutki. Gholston says he was not resisting arrest, but he did not obey the officers' verbal commands. The taser report shows that Gholston was

---

[4] For a more detailed discussion of cases involving Tasers in the Sixth Circuit, see Bailey Jennifer Woolfstead, *Don't Tase Me Bro: A Lack Of Jurisdictional Consensus Across Circuit Lines*, 29 T.M. Cooley L. Rev. 285, 311–314 (2012).

tased by Tylutki nine times.  Gholston says he was repeatedly tased in his back while he was face down on the ground.  Gholston also says that he was tased while in handcuffs.

Tylutki's explanation of what occurred is very different.  Tylutki testified at his deposition that he arrived to the restaurant while Baur was struggling with Gholston in an attempt to put handcuffs on him.  Baur testified at his deposition that he told Tylutki to tase Gholston as soon as Tylutki arrived at the kitchen area of the restaurant.  The officers' position is that Gholston was actively resisting arrest and the use of the taser nine times was justified.

There is no videotape of what occurred in the kitchen area of the restaurant.  Gholston's story is much different than the police officers' story.  On summary judgment, the Court must draw all reasonable inferences in favor of Gholston.  Gholston has proffered sufficient evidence putting into question the lawfulness of the tasing.  A jury must weigh credibility in deciding whether to believe Gholston or the police officers.  Summary judgment will, therefore, be denied to Tylutki on the excessive force claim arising out of the use of the taser.

### ii. The Officers' Slamming Gholston's Head to the Ground

Like the excessive force claim based on Tylutki's use of the taser, Gholston's claim that Baur, Tylutki, and Vincent used excessive force by slamming his head to the ground requires submission to a jury.

Gholston says that, while in the kitchen area, his head was slammed to the ground. He says that he chipped his tooth as a result.  Although there is no videotape of what occurred, there is evidence to suggest that Gholston's tooth was chipped during the struggle in the kitchen area.  Baur's use of force report indicated that Gholston suffered a

21

chipped front tooth.  Drawing all reasonable inferences in favor of Gholston, a jury may conclude that one of the defendants used excessive force in slamming Gholston's head to the ground.

The police officers do not offer any legal basis for their contention that they are entitled to summary judgment on this claim.  Rather, the officers factually deny that they slammed Gholston's head to the ground.  Determining what happened requires a jury to weigh credibility, draw inferences, and make factual findings.

Further, although Gholston does not know for certain which officer slammed his head to the ground, drawing all reasonable inferences in favor of Gholston, all of the officers had direct involvement and an opportunity to prevent the harm from occurring.  The Sixth Circuit has held that a police officer who fails to prevent the use of excessive force by another officer may be liable in a § 1983 action if "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Kijowski*, 372 F. App'x at 599 n.8 (citation and quotation marks omitted).  Accordingly, Baur, Tylutki, and Vincent will be denied summary judgment on the excessive force claim arising out of the slamming of Gholston's head to the ground.

### iii. The Officers' Failure to Loosen Gholston's Handcuffs

Gholston argues that Baur, Johnson, Johansen, and Vincent used excessive force by failing to loosen his handcuffs despite his constant complaints that they were on too tight.  Gholston claims that all of these officers were present and heard his pleas to loosen the handcuffs.  Gholston has proffered sufficient evidence to establish a material factual issue on this claim.

Gholston testified at his deposition that, despite multiple pleas to the officers to loosen his handcuffs, they refused to do so.  The officers all concede that, at one point or another during the entire incident, Gholston complained about the handcuffs being on too tight.  However, they say that Baur immediately loosened them after Gholston complained.  Gholston disputes this.  This issue is for a jury to decide.  A jury must determine whether Gholston's testimony that the officers ignored his pleas to loosen the handcuffs is credible.

Gholston's photographs establish that the handcuffs left skin marks on his wrists. (Doc. 34-8 at 2–3, Gholston Wrist Photographs).  In addition, the paramedics' reports and the hospital summaries describe Gholston's wrist marks.

### iv. The Officers Are Not Entitled To Qualified Immunity

There can be no dispute that if a jury accepts Gholston's testimony as true, defendants are not entitled to qualified immunity.  It is clearly established that police officers cannot use excessive force by tasing a person who is not resisting arrest,[5] slamming his head to the ground, and refusing to loosen his handcuffs if they are on too tight.

## B. Deliberate Indifference (Count II)

### 1. Legal Principles

Pretrial detainees, like prisoners, may assert an Eighth Amendment claim of deliberate indifference under § 1983.  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).  As the Sixth Circuit has explained:

> A constitutional claim for denial of medical care has objective

---

[5] Although the record does support a finding that Gholston may have initially been resisting arrest, whether Gholston continued resisting arrest requires weighing the credibility of witnesses and drawing inferences.  This, of course, is for a jury to decide whose testimony it finds credible.

23

and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001); *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). The objective component requires the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "As the Supreme Court explained in *Farmer*, 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Brown*, 207 F.3d at 867 (quoting *Farmer*, 511 U.S. at 834).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown*, 207 F.3d at 867 (citing *Farmer*, 511 U.S. at 834). This subjective component "should be determined in light of the prison authorities' current attitudes and conduct." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also LeMarbe v. Wisneski*, 266 F.3d 429, 435 (6th Cir. 2001). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

*Id.* at 895–96.

### 2. Analysis

Gholston's deliberate indifference claim suffers from a fatal defect: he was not denied medical care. Gholston was seen twice by a paramedic–once immediately after the incident in the kitchen area and a second time at the police station. After being seen by a paramedic at the police station, Gholston says he requested to be taken to a hospital because he was having trouble breathing. He was taken to the hospital in an ambulance where he stayed overnight. Thus, assuming without deciding that Gholston suffered from

a sufficiently serious medical need, he has not established that he was denied adequate medical treatment. Accordingly, defendants were granted summary judgment on the deliberate indifference claim.

## V. CONCLUSION

For the reasons stated above, defendants' motions for summary judgment were granted in part and denied in part. Count I (Excessive Force) will go forward against all defendants. Specifically, the questions for a jury to decide are:

(1) whether Tylutki used excessive force in tasing Gholston;

(2) whether Baur, Tylutki, and Vincent used excessive force by slamming Gholston's head to the ground; and

(3) whether Baur, Johnson, Johansen, and Vincent used excessive force in refusing to loosen Gholston's handcuffs.

Count II (Deliberate Indifference) was dismissed against all defendants because Gholston cannot establish that he was denied medical treatment.

SO ORDERED.

 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: July 26, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 26, 2013, by electronic and/or ordinary mail.

 S/Sakne Chami
Case Manager, (313) 234-5160

25